1  STEVEN W. MYHRE
   Attorney for the United States
2  Acting Under Authority Conferred by
   Title 28, United States Code, Section 515
3  JAMES E. KELLER
   Assistant United States Attorney
4  100 West Liberty Street, Suite 600
   Reno, Nevada  89501
5  (775) 784-5438

6  Attorneys for Plaintiff.

7                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
8

9  UNITED STATES OF AMERICA,          Case No. 2:14-CR-00022-KJD-CWH

10              Plaintiff,            GOVERNMENT'S
                                      SENTENCING MEMORANDUM
11       vs.

12  ROBERT CHRISTOPHER READE,

13              Defendant.

14

15       The United States, by and through the undersigned, respectfully submits its Sentencing

16  Memorandum in the above-captioned case.  This filing is timely.

17                              **INTRODUCTION**

18       This case is about an experienced Nevada attorney who, motivated by greed and profit,

19  untethered himself from his professional responsibilities and knowingly embroiled himself in his

20  clients' fraud and money laundering scheme, abandoning his role as an attorney and transforming into

21  an accessory-after-the-fact by knowingly lying and cheating to advance and conceal an invidious fraud

22  that netted millions of dollars and devastated the lives of its victims in the process.  As we explain more

23  fully below, the defendant's offense conduct at issue here is not a "one-off" act spawned by the

24  unfortunate coupling of naïveté and necessity.  It is, rather, a knowing, calculated, and sophisticated

1  course and pattern of conduct, conduct motivated by greed and engaged in over time, conduct the

2  defendant knew full well was wrong, conduct the defendant knew full well ran contrary to his

3  professional obligations as an attorney, and conduct the defendant knew full well would hurt others.

4     The government will contend, therefore, that a guideline sentence that includes an 18-month

5  term of imprisonment is fully warranted in this case.  A sentence along those lines not only addresses

6  the serious nature of the offense conduct evidenced here, but is entirely fair when considering the

7  sentences already meted out to the principal proponent of the fraud, Rick Young, and his co-

8  conspirator/assistant, William Willard.  Willard and Young were convicted and sentenced for the fraud

9  scheme in December 2011.  *United States v. Young and Willard*, 3: 08-cr-0120-LRH-VPC.

10  **FACTS**

11     In support of the following facts, the government relies upon the facts contained in the

12  Presentence Investigation Report ("PSR"), the attached exhibits, and any witness testimony it may

13  adduce at the sentencing hearing.  In the event the defendant argues for a below-guidelines departure to

14  a non-custodial sentence, the government intends to present two witnesses from the National Futures

15  Association ("NFA") to provide further evidence for the Court to assess the facts and circumstances

16  surrounding the offense conduct at issue.

17     **A.     The Fraud.**

18     The PSR fairly and accurately describes the underlying investment fraud scheme of which

19  Reade ultimately became a part.  To recap, Reade's clients, Rick Young and William Willard, owned

20  and operated Global One, an internet company that purportedly trained others how to trade in the

21  foreign currency futures market, also referred to as the FOREX.  Although Willard was nominally

22  named the Vice-President, Young, touting himself as a world-class FOREX trader who rarely made a

23  losing trade, actually controlled the company and devised the strategies for making money, including

24  selling memberships in Global One.  From about 2005 to 2008, Young advertised that for a monthly fee

1   an investor could purchase a Global One membership which entitled that person to access Young's

2   exclusive web-based training seminars (dubbed "webinars") where Young would reveal his secrets to

3   becoming rich using his "can't lose" techniques and strategies for trading in the FOREX.

4        The webinars, however, amounted to nothing more than long sales pitches for selling more

5   memberships and getting people to invest their money with Global One.  The webinars mesmerized

6   listeners as Young regaled them with long tirades touting his views on life, religion, politics, investing,

7   and trading. Among other things, Young pitched that he developed a "proprietary" automated trading

8   program called "Global Trac," which, according to him, boasted a 95% win rate in the market, a claim

9   he backed up with charts and graphs that he said reflected the programs trading record.  The centerpiece

10  of his pitch, however, was the so-called "profit-sharing" program where members "loaned" money to

11  Global One in return for a promise they would share in a piece of the profits that surely would be

12  generated by the winning Global Trac automated trader.  Conveniently, however, the fine print in the

13  agreements specified that Global One was obligated to repay the "loans" only when it made money; in

14  other words: no profits, no repayment.

15       The 2010 Indictment against Young and Willard centered on their numerous misrepresentations

16  about the profitability and trading capabilities of Global One, enumerating charges of wire fraud,

17  conspiracy, and money laundering. Before trial, Willard pleaded guilty to conspiracy, agreeing to

18  cooperate with the government in its case against Young.  Young, on the other hand, proceeded to a

19  jury trial in March 2011 before United States District Judge Larry Hicks, where, following three weeks

20  of evidence, the jury convicted Young.  *United States v. Young,* 3: 08-cr-0120-LRH-VPC.

21       The evidence presented at trial proved, among other things, that Young's so-called automated

22  trader, "Global Trac," did not exist and trades that Young advertised as automated were, in fact,

23  executed manually by Young and Willard. Further, contrary to the data reflected in the many charts and

24  graphs he posted to his website, Young placed losing trades, repeatedly subjecting his investors to

margin calls and sustaining huge loses at an alarming rate.  These, he tried to explain away to his investors (and later to the jury at his own trial), were caused by a conspiracy between FOREX brokers and regulators to keep the "little guys" from competing in this lucrative market and by deficiencies in the brokers' trading platforms that supposedly caused delays in placing trades picked and ordered by Global Trac.

The evidence at the Young trial also showed that the so-called profit sharing plan was nothing more than an elaborate Ponzi scheme where Young paid out returns to his investors using the money he fraudulently solicited and obtained from later-in-time investors, falsely representing the payouts as "profits" and using the payout as a basis to solicit even more investments. Within about 18 months, Young's Ponzi scheme netted over 250 victims and $16 million in fraudulent proceeds which he promptly used to buy real estate, race cars, motorcycles, tow trucks, a boutique for his wife, houses for each of his kids, and otherwise support a lavish lifestyle.  Gov't Tr. Exs. 66, 81, both attached hereto as Exhibit 6.  In total, he fleeced about 1400 people, bilking some of the more vulnerable victims out of everything they owned. *Id.*

### B.      Reade Learns of the Fraud and Conceals It From Others.

Reade entered the picture in about February 2007, when Young and Willard retained him to assist with company transactions. Eventually, he came to represent Global One in a business transaction involving the purchase of a FOREX brokerage, called "Trend," and in litigation involving a former contractor and disgruntled investors.  It was through this course of dealings with Young that Reade, an experienced commercial litigator (PSR ¶¶ 71-74), learned of Young's fraudulent schemes and assisted him in concealing it from others.

### 1.      Reade Assists In The Purchase of Trend And Lies To The NFA.

As Global One continued to rake in money through its fraudulent profit sharing plan, Young hatched a plan to launder the proceeds by purchasing Trend.  FOREX brokerages like Trend are cash

cows that make a tremendous amount of money by earing commissions on every trade regardless whether it's a winner or a loser.  For example, one former dealer testified at the Young trial that he earned as much as $60,000 a month from a relatively small dealership. *See* Steve Janjic Tr. Test. at 1429, 1439-40, attached hereto as Exhibit 7.  Young was drawn to this plan by the promise of huge profits to be gained by sending Global One clients to Trend to make their trades; Reade was a willing instrument eager to make it happen.  *See* Willard Tr. Test. at 34-35, 40, attached hereto as Exhibit 8.

To do business in the United States, FOREX dealers must be registered with – and are regulated by – the NFA, an self-regulatory organization within the commodities futures industry.  In fulfilling its responsibilities, the NFA is tasked with the review and approve all purchases of FOREX broker/dealers.

Under NFA regulations, Young (as Global One) was disqualified from purchasing Trend for at least three reasons: (1) he had a conflict of interest arising from his solicitation of investors to trade through his Global Trac program; (2) his cash was obtained through loans from his members and thus was considered encumbered; and (3) he had a criminal history.  Reade helped Young try to get around these obstacles by holding himself out to the NFA as the true purchaser of Trend and concealing the true relationship between himself and Young.  To do so, he used his skills and talents as an attorney to set up straw corporations and to move money from Global One's accounts into bank accounts under his name and that of his straw companies. With this in place, Reade signed the purchase agreement for Trend in April 2007 and held himself out to be the purchaser in fact.

When, in that same month, the NFA learned of the Trend purchase contract, it opened an audit and questioned Reade about the transaction. Cynthia Ioannacci, the then-Director of  Investigations for the NFA, testified at the Young trial about the false representations that Reade made in an attempt to get through the audit. *See* Exhibit 12. Among other things, Reade misrepresented that:

- He would be the sole owner of Trend, and no other entity or individuals would have any ownership interests in Trend. *Id.* at 1255; see also NFA Findings, ¶ 44, attached hereto as Exhibit 14.The funds for the purchase of Trend were his personal funds and contributions.  Exhibit 12 at 1296-97; *see also* Reade's letter to the NFA, Exhibit 13.

- Neither Global One nor Rick Young had any ownership or operational interest in Trend.  Exhibit 12 at 1272-73; see also Exhibit 14 at ¶¶ 15-16.

- Reade did not have any agreement with Global One over the purchase of Trend. Exhibit 12 at 1275.

- Neither he nor Trend received any payments of money from Global One.   Exhibit 14 at ¶ 16.

-  Reade was not aware of the names of officers of Global One. Exhibit 14 at ¶ 44.

    In truth and in fact, however, Reade well knew at the time who Young was, the true source of the funds to be used for the purchase, and Young's role in the purchase because, at the time of his representations to the NFA, Reade had already established the straw entities and moved money from Global One's accounts in order to effect the purchase.

- In March 2007, Reade created a shell company called Way FX, listing himself as President, Secretary, Treasurer and Director.   See Gov't Tr. Ex. 111, attached hereto as Exhibit 9.

- Contemporaneously, he established a bank account for Way FX at Washington Mutual, making himself the signatory authority on the account.  PSR ¶ 16.

- Reade caused the transfer of $2.25 million of Global One assets to Way FX's account in March and April 2007, Gov't Tr. Exhibits. 142 - 145, attached hereto as Exhibit 11; see also PSR ¶ 18.

- On March 19, 2007, Reade caused the transfer of $1,000,0000 from Way FX to Trend. *Id.*

- On March 30, 2007, Reade caused the transfer of $250,000 and a separate transfer of $275,000 from Way FX to Trend. *Id*.

- On April 25, 2007, Reade caused a transfer of $1,250,000 from Global One to Way FX. *Id*.

- On April 25, 2007, Reade caused a transfer of $1,250,000 from Way FX to Trend. *Id*.

The evidence adduced both at the Young trial as well as the evidence the government seeks to adduce at Reade's sentencing hearing shows the blatant, deliberate and calculated nature of the lies that Reade told, all in an attempt to fly this transaction under the NFA's radar.  Although the NFA was ultimately successful in disapproving this purchase, it did so only after doggedly pursuing the paper trail and uncovering Reade's lies.  When the NFA discovered that Global One, and not Reade, was really behind the purchase of Trend, Reade agreed to a lifetime ban from engaging in any purchase or participation in any entity regulated by the NFA. *See* Exhibit 1.

In August 2007, and after it was clear that the NFA would not approve Reade's attempted purchase of Trend, Reade continued to transfer money on behalf of Young.

- On August 8, 2007, $1,500,000 from Trend to Way FX.  See Kressin Affidavit in Support of Search Warrant, attached hereto as Exhibit 15, at 26-27.

- On August 8, 2007, $1,500,000 from Way FX to Global One.  See Exhibit 15 at 27.

- On August 8, 2007, $670,000 from Global One to one of Young's Paystone accounts in Canada (Paystone was the Canadian equivalent of PayPal). *Id*.; *see* PSR ¶ 24.

- On August 8, 2007, $600,000 from the Global One to UBS Swiss bank account for the benefit of Rick Young. *Id*.; *see* PSR ¶ 24.

- On August 21, 2007, wrote a check for $75,000 made payable to Reade and Associates. *Id*.; *see* PSR ¶ 27.

**B.      Reade Misrepresents Facts to the Nevada District Court in the Walsh Litigation**

In 2008, Reade represented Global One and Young in litigation brought by an unhappy investor named Patrick Walsh (hereinafter the "Walsh Litigation").  In that litigation, Walsh claimed, among other things, that Young's profit sharing plan was a Ponzi scheme and that Young was using the loan money for personal use.

On February 15, 2008, Reade appeared on behalf of Young and Global One before Nevada State District Court Judge Allan Earl in connection with a hearing in the Walsh litigation.  The transcript of that hearing, attached hereto as Exhibit 2, reveals that Reade made the following misrepresentations before Judge Earl:

- Global One was not involved in the investing of their customer's money and they only provided training about spot trading in the FOREX market.  In truth and in fact, Young traded the funds of Global One members.

- Trend Commodities had nothing to do with Global One Group LLC.  As demonstrated above, Global One was the real party in interest with Reade acting as a straw purchaser.

- None of Reade's clients had an interest in Global One Group.  In fact, Young and Willard were the principals in Global One.

- Reade stated his role within Global One was limited to that of trial counsel even though he was the signatory on two of their bank accounts, he had participated in the attempted Trend purchase and had moved money between bank accounts associated with Global One.

Reade's misrepresentations before Judge Earl show his continuing course of conduct to conceal the fraud and protect Young from punishment, coming long after he knew of the fraud from his dealings with the NFA.

C.      **Sentences of Young and Willard.**

For his part in the Global One fraud, the Court sentenced Willard to 15 months' imprisonment, in accord with a plea agreement where Willard pleaded guilty to the conspiracy and agreed to cooperate with the government.  In reaching this sentence, the Court departed downward significantly from the total offense level based on Willard's cooperation as demonstrated by the his testimony at the Young trial.

Young's fate was much different, receiving a guideline sentence of 300 months' imprisonment, which included enhancements for, among other things, his role in the offense, the overall loss amount in excess of $13 million and the involvement of over 250 victims.  At the sentencing hearing, the court stated that it considered the vulnerable nature of the many of the victims of Young's fraud, reading excerpts from the many letters the court received from some from them.

According to the Court, one victim stated that she "will lose $4800 a year for the balance of her life in lost social security benefits . . . It's created so much tension in her marriage . . . . the fact that her divorce occurred in May of 2010 tells the Court much of which I would need to know. . . . ." The Court continued, "There is no question that a person at the age of 64 who has to re-enter the work force after that kind of a history will have many sleepless nights and anxiety attacks which will extend for the balance of their lives."  Sent. Tr. at 129-130, Exhibit 18.  Furthermore, the victim reported to the Court

1    that she "had to borrow money from both of my daughters and my brother to make ends meet.  That

2    total amount borrowed was $25,000, which I cannot pay back."  Sent. Tr. at 130, Exhibit 18.

3         The Court read the impact statement of another victim, who stated, "I lost three-quarters of my

4    life savings.  I am 54 now, and I am single.  I am expecting to have to work into my 70s to try to make

5    up for what I lost I was married when this happened.  Actually, we were newlyweds.  It played a big

6    part in our eventual split."   See Sent Tr. 131-32; Exhibit 18.

7         The Court also commented on the obvious and rampant nature of the fraud and defendant

8    Reade's role in it:

9         [C]ertainly the defendant Willard, Vern Hedquist, the attorney Reade, the man-of-the-
          cloth Scotson, and others who were closely involved in this being perpetuated over a two-
10        year period – and just the magnitude of this particular offense, the number of people
          involved, the use of the payment plans, the way that the funds were churned and turned
11        over, there is no question in the Court's mind that there were far more than five
          participants, people who were, likely, not of the kind to want to initiate and commit this
12        kind of criminal activity but, nonetheless, were aware or would be, at the least, charged
          with being aware of the criminality of what was going on [as] rampant.  Sent. Tr. 125-26,
13        Exhibit 18.

14        Commenting on the overall nature and sophistication of the fraud, the Young sentencing court

15   further commented:

16        There is absolutely no question of any kind that this was a sophisticated means fraud.  It
          was fraud which, frankly, is a product of and facilitated by the Internet.  That doesn't
17        make it less than sophisticated. . . . I can't begin to draw on what the total number of
          webcasts were by the Defendant Young being presented to anyone who had become
18        involved as an investor . . . .The back-room issue, the charts, the flows, the
          representations concerning Global Trac and everything that went with it, the treatment of
19        funds and the payback of what was represented to be commissions which, frankly, was
          nothing more than a Ponzi type of fraud, was so incredibly sophisticated when viewed in
20        the eyes of the victims who were suffering loss here.  Tr. 123-124, Exhibit 18.

21                                       **APPROPRIATE SENTENCE**

22        The government agrees with the PSR's assessment that Reade be adjudged a sentence of 18

23   months' imprisonment and fined $40,000. This sentence comports not only with Guideline Range

24   agreed to in Reade's plea agreement, but is fair when assessing the factors under Title 18, United States

Code, Section 3553(a).  More to the point, however, it brings defendant Reade's case in line with other participants in the Global One fraud scheme.

### A.      Nature and Characteristics of the Offense

As shown above, the offense conduct, together with the other relevant conduct in this case, occurred over a period of two years and involved deceit, deception and dishonesty at a very high level. Young had engaged in a sophisticated and multi-layered fraud that caused huge financial harm to a great many people.  Although Reade has pleaded guilty only to being an accessory after the fact to the money laundering aspect of the fraud, Reade nonetheless knew what Young was up to at the time.  By all accounts as set out in the PSR, Reade was an able and very experienced attorney when he was initially came into contact with Willard and Young.  Certainly by the time he was confronted by the NFA and asked about Young's involvement in the purchase of Trend, Reade knew that Young was up to no good.

Yet, Reade did not stop.  He lied to the NFA for Young; he set up shell companies to act as straw purchasers for Young; and, most importantly, he moved the money for Young, the money that belonged to the victims, the money that was obtained by fraud, the money that fueled Young's enterprise.

Even if Reade had doubts about whether all of this was fraudulent or whether he was in fact assisting in the laundering of dirty money – and the record evidence does not suggest that he ever had such doubts – his ethical considerations alone should have counseled him to stop, to not lie, to not enter into business transactions with a client, to not handle his clients' money.  Reade, however, cast these very basic ethical principles completely aside for no apparent reason other than greed fueled by the thought of getting into the lucrative business of collecting commissions from FOREX traders.

From at least April 2007 through June 2008, Reade remained part of and involved in a fraudulent enterprise that caused great harm to many, many victims. The very planned and deliberate

1    nature of Reade's perfidious conduct over that course of time thus dictates that he should receive a term

2    of imprisonment.

3          **B.**      **Seriousness of the Offense and Need to Promote Respect for the Law**

4         The seriousness of the offense is reflected in the sentences adjudged for the other participants in

5    the Global One fraudulent enterprise: Young received 300 months and Willard 15 months.  Neither of

6    them had the same level of training and education as Reade.  Both of them had only meager educational

7    backgrounds and neither of them had any legal training or experience whatsoever to guide their actions.

8         Reade, on the other hand, had the advantages of a fine legal education, the benefits of

9    membership in the bar, and a high level of sophistication gleaned from almost ten years of legal

10   experience by the time he became embroiled in the offense conduct.  Reade simply has no excuse for

11   his conduct here.

12         As has been shown above, the underlying fraud is very serious given the devastating losses

13   suffered by the victims, many of whom were elderly and lost everything with no time to start over.  To

14   sentence Reade – who knew better – to a non-custodial sentence would send the message that attorneys

15   somehow get a break.  And although Reade has not admitted to being involved directly in perpetrating

16   the fraud, his provided valuable assistance that as critical to advancing the fraud as the actual lies made

17   to the investors.

18         **C.**      **Provide Deterrence and Protect the Public From Further Crime.**

19        While the chances that Reade will re-offend are relatively low, a custodial sentence would

20   nonetheless send an appropriate message to deter others from engaging in such conduct.  Fraud is an

21   insidious crime that while not causing physical harm in most cases, is nonetheless emotionally

22   devastating.  One need look no further than common life experiences to recount examples of lost

23   homes, destroyed relationships, and devastated careers resulting from victimization due to fraud.

24

1    A custodial sentence sends the appropriate message to the community that this conduct will not

2  be tolerated and, more specifically, for members of the bar.  A custodial sentence will reinforce what

3  should be a readily apparent principle: that the first rule of practicing law is to obey the law.

4  **CONCLUSION**

5    Wherefore, for all the foregoing reasons, the government asks the Court to hold Reade

6  accountable for his actions and impose a guideline sentence in this case which includes a term of

7  imprisonment.  In accord with the plea agreement in this case and the PSR, the government seeks a

8  sentence of 18 months' imprisonments and a fine of $40,000.  However, in the event the defendant

9  argues for a non-custodial sentence, the government will, according to the terms of its plea agreement

10  with the defendant, seek and provide evidentiary support for a sentence of 24 months' imprisonment.

11    DATED this 8th day of July, 2014.

12    Respectfully submitted,

13    STEVEN W. MYHRE
      Attorney for the United States of America

14
      /s/  Steven W. Myhre
15    /s/  James E. Keller

      _____
16    STEVEN W. MYHRE
      JAMES E. KELLER
17    Assistant United States Attorneys

18

19

20

21

22

23

24

CERTIFICATE OF SERVICE

It is hereby certified that pursuant to LCR 47-11 service of the foregoing GOVERNMENT'S SENTENCING MEMORANDUM was made through the Court's electronic filing and notice system (CM/ECF) on July 8, 2014.

/s/ Steven W. Myhre

_____

STEVEN W. MYHRE
Assistant United States Attorney