Richard A. Wright
Nevada No. 886
Margaret M. Stanish
Nevada No. 4057
WRIGHT STANISH & WINCKLER
300 S. Fourth Street, Suite 701
Las Vegas, NV 89101
Phone:  (702)382-4004
Fax:     (702)382-4800
Counsel for E. Christopher Reade

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 2:14-CR-00022-KJD-CWH |
| Plaintiff, ) | **DEFENDANT'S SENTENCING MEMORANDUM** |
| vs ) | |
| R. CHRISTOPHER READE, ) | |
| Defendant. ) | |

R. Christopher Reade, by and through his attorneys, Richard A. Wright and Margaret M. Stanish, Wright, Stanish & Winckler, respectfully requests that the Court sentence him to a sentence of probation with conditions deemed appropriate by the Court.  This is a fair and meaningful punishment befitting Mr. Reade's offense conduct and his personal background and characteristics.  It represents a sentence that is no greater than necessary to promote the objectives of punishment.

**1.**      **Introduction**

On January 22, 2014, Mr. Reade pleaded guilty to Accessory after the Fact to Laundering Money Instruments in violation of 18 U.S.C. §3.   The case arises from  Mr. Reade's role as an attorney representing Global One Group, an internet business that conducted education and training in the trading of foreign currencies and operated by Rick Young, William Willard, and Vernon Hedquist.   The guideline calculation in the PSI comports with the plea memorandum.  The

advisory guideline range is 18 to 24 months based on a total offense level of 15 and zero criminal history points.  The Probation Office recommends 18 months in prison.  The government agreed to recommend the low-end; however, it reserved its right to argue for a higher sentence within the applicable guideline range if Mr. Reade asks this Court to impose a sentence below the guidelines range under 18 U.S.C. §3553(a).  Plea Memorandum, p. 11, para. VIII.

Mr. Reade respectfully requests that the Court impose a term of probation, which is sufficient, but not greater than necessary, to achieve the goals of punishment in accordance with Section 3553(a).   In his zeal to represent and protect the interests of Global One, Mr. Reade stepped over the line of ethical and lawful conduct.  He greatly regrets that his conduct hindered the ability of law enforcement to prosecute Young and recover funds obtained by Young and others.

This memorandum will describe the nature and circumstances of Mr. Reade's offense conduct in the context of a complex fraud, much of which predated his representation and occurred without his knowledge.  Before addressing the offense conduct, discussion begins with a chronology of Mr. Reade's background so that this Court may more precisely analyze the sentencing factors in 18 U.S.C. §3553(a).

## 1.   **Mr. Reade's Personal History and Characteristics**

Mr. Reade is a dedicated family man and lawyer.  He loves his family and he loves the law.   The remorse and shame that he has experienced as a result of his misconduct is beyond measure and words.  An analysis of Mr. Reade's personal background and characteristics will give this Court assurance that a probationary sentence will sufficiently deter recidivism on his part, send a strong deterrent message to others, and promote respect for the law.

Mr. Reade has led an extraordinary life, not because of privilege or wealth, but rather a genuine drive to help people through the practice of the law.  The following description of Mr. Reade's social background and characteristics is drawn, in part, from the numerous letters of

2

support from Mr. Reade's family, friends, attorneys, and clients, which have been previously furnished to the Court.

### Mr. Reade's Early Years

Mr. Reade was born on October 15, 1970, in Omaha, Nebraska.  True to the culture of their home state, his parents, Robert and Carolyn Jean, instilled in him and his two younger brothers the traditional Midwestern values of hard work, integrity, and devotion to religion, family, and community.   Mr. Reade describes his childhood as "idyllic."   His family environment was loving, supportive, and productive.

 Mr. Reade's formative years were spent in school and the family's business.  Through his father's plumbing parts distribution business, Mr. Reade learned and lived the values of working together for a common cause, helping one another, and assuming responsibilities.  By age 11, it was the norm for him to spend weekday evenings and Saturdays with his family in the warehouse or office where he would count inventory, answer phone calls, and organize paperwork. When his father was absent on frequent business trips, Mr. Reade would assume greater responsibilities at home taking care of his two younger brothers while his mother worked at the business.  At age 15, Mr. Reade's father was involved in a serious car accident while on a business trip and for several months while he recuperated, Mr. Reade's role in the business and the family was substantially increased.

Mr. Reade excelled in school.  He earned scholastic honors, edited the school newspaper, wrote poetry, and participated on the varsity debate team, Boy Scouts, team sports, and other extracurricular activities.  He helped tutor those needing academic help.   As his parents write in their letters of support, their son was self-motivated, smart, and sensitive to the needs and plight of others.  His sensitivity and genuine desire to help people was apparent at an early age.  Both parents highlight his close and supportive relationship with a schoolmate who suffered through years of Ewing's Sarcoma (cancerous bone tumors) and ultimately succumbed to it.  While other children avoided this child, Mr. Reade visited her nearly every day for months on end whenever

she was hospitalized during their middle school and high school years.   As noted in the PSI and his mother's support letter, his experience at an early age with the suffering and death of his friend was profoundly traumatic for Mr. Reade. PSI, ¶43.  It was also an early example of Mr. Reade's positive character for empathy and compassion that he would continue to exhibit throughout his adult life.

### College and Law School Years

Mr. Reade attended the University of Nebraska on an academic scholarship. He studied in the university's Honors Program, majoring in the study of Politics and Philosophy and graduated Magna Cum Laude in 1993.  He continued to participate in extracurricular activities, including student government and the Sigma Nu Fraternity.  He interned with the American Legislative Exchange Council in Washington, D.C. and studied abroad in Lancaster University in Great Britain during his junior year.  Several of his college friends have written letters of support for Mr. Reade attesting to his good character and willingness to help those in need.

Upon completion of his undergraduate studies, Mr. Reade began law school at the University of Nebraska College of Law.  He participated in moot court and the Inns of Court.  He received various awards for academic performance in Alternative Dispute Resolution and Copyright Law and graduated with distinctions in 1996.  Throughout law school, he maintained employment as a clerk at Wolfe, Snowden, Hurd, Luers & Ahl.  It was in law school where he began his commitment to community service in the Community Legal Education Project.

### Legal Career

Mr. Reade continued to work for one year at the law firm where he clerked, becoming a member of the Bar in both Nebraska (1996) and Colorado (1997).  He also studied chemistry to foster his interest in intellectual property law.  In 1997, he made his way to Las Vegas to work with and ultimately practice law with Hanigan &Dowling, being admitted to the Nevada Bar in 1998.  In 1999, he joined the law firm formed by Elizabeth Goff Gonzalez. The firm concentrated on construction defect and complex civil litigation.  Mr. Reade's practice focused on commercial,

corporate, and real estate litigation. In January 2003, he became a partner in Gonzalez Howard &

Reade.  In 2004, the firm dissolved after Ms. Gonzalez was appointed to the state bench and Mr.

Reade joined Lee & Russell.

In May 2005, Mr. Reade formed his own firm, Reade & Associates.  He began as a solo

practitioner and gradually built his practice to include up to five attorneys and eleven employees.

The firm continued to concentrate of business and real estate law, but each associate was free and

fostered to pursue their own interest in other areas of law.  Over time, Mr. Reade earned an AV-

Rating from Martindale Hubbell and his firm attracted the business of prominent national and local

business and individual clients.  Several of his present and former associates and staff have

provided letters of support to the Court, each relating positive experiences about Mr. Reade

helping them in their professional, and often, in the personal lives.

Numerous attorneys in the Nevada Bar and elsewhere have written strong letters of

support for Mr. Reade.  These attorneys range from young attorneys who have looked to Mr. Reade

as a mentor to seasoned attorneys.  All express their respect for Mr. Reade's professionalism and

intellect.   Additionally, several business clients have written support letters for Mr. Reade.  Many

of these attorneys and clients count Mr. Reade as a trusted friend.

### Law as an Instrument to Help People

Mr. Reade became a lawyer to help people.  His mother, Carolyn Jean Reade, best

captures this life-long ambition in her letter to the Court:

> Chris set his sights on becoming an attorney while in grade school and has always aspired to seek justice.  It was his wish to help people with any legal issues they might encounter.  From asking his father to take him to tour the Douglas County Courthouse, to joining the Law Explorer Post, to meeting with local attorneys and politicians. *Chris loved the law and idea that the law was an instrument to help people.  The financial reward of the profession did not motivate him.  Rather, it was his strong desire to be of service to people and to determine how the law could improve people's lives.  The opportunity to serve people through the law has never been Chris's job but his true calling, love and identity.*

[Emphasis Add.]

5

As reflected in the many letters of support, Mr. Reade's early philosophical view of the law as an instrument to help people became the touchstone of his career as a lawyer.   Numerous letters of support, particularly those from the directors of the Legal Aid Center of Southern Nevada and Senior Law Center, and other attorneys committed to pro bono service, attest to Mr. Reade's true character as a selfless man who uses the law as an instrument to help people in need.

From 2005 to 2013, Mr. Reade personally performed approximately 837 hours in pro bono case work.  His pro bono work has included the protection of consumer rights, domestic relations, landlord-tenant law, debtor rights, and advocacy for neglected and abused children.   Mr. Reade has created a culture of pro bono service at Reade & Associates and the other firms where he previously worked which has been used a model for other firms to adopt.  In fact Mr. Reade was one of the authors of the Model Pro Bono Policy for firms to adopt as a member of the Eighth Judicial District Court Pro Bono Recruitment Committee.  He required his associates to each have at least one active pro bono case in their work load at all times.   From 2005 to 2013, his small law firm provided approximately 1,930 hours in pro bono case work in Southern Nevada.  Notably, several of the attorneys writing support letters for the Court's consideration have highlighted the fact that Mr. Reade encouraged them to take their first pro bono case and helped them learn a new area of law.  In turn, these attorneys became converts to pro bono service.

The following is a chronology of Mr. Reade's commitment to pro bono service in Nevada.   In 2002, Mr. Reade was honored as one of the members of the Clark County Legal Services Small Firm of the Year for Pro Bono Service.  In 2003, his former law firm of Gonzalez Howard and Reade was awarded by the Nevada Supreme Court the State Bar of Nevada Access to Justice Firm Award.  He also became involved in the Children Attorneys' Project in 2000.   In 2003,, Mr. Reade received the Sally Loehrer Pro Bono Service Award, which recognizes excellence in the service of pro bono clients in civil litigation.

Mr. Reade was selected to serve on the Eighth Judicial District Pro Bono Recruitment Commission, which was commissioned by the Nevada Supreme Court to address the lack of

adequate representation of underprivileged individuals before the state and federal courts in Clark County.  As part of this position, he coordinated numerous meetings before the bench and bar, most notably Clark County's large and medium sized firms, to encourage the development of public service and pro bono policies within firms and the adoption of areas of need by firms.

In 2004, Mr. Reade was awarded the Lied Award for the Most Pro Bono Cases performed by an individual attorney.  During his tenure with Lee & Russell, he improved the firm's commitment to pro bono work, which led to it receiving the Clark County Legal Services Medium Firm of the Year Award to Lee & Russell in 2005.

Soon after establishing his own firm, Mr. Reade was awarded the Louis Wiener Pro Bono Service Award for *pro bono* representation of victims of domestic violence in 2005.  This same year, Mr. Reade joined the State Bar of Nevada Lawyers Referral and Information Service (LRIS). By 2007, he was appointed to the LRIS Committee and became its Chairperson in July 2010.  As the Chairperson, Mr. Reade oversaw the development and operation of numerous programs, including the awarding of $1.4 million in grants to various  Nevada legal service providers and law-related public service and education organizations, the funding of the State Bar's first Diversity Scholarships and renewed funding of the State Bar's Law-Related Education

For approximately ten years, Mr. Reade served on the State Bar Fee Dispute Committee as an arbitrator and mediator.   In 2006, he was appointed by the Eighth Judicial District Court to serve as a court-approved arbitrator in civil litigation cases.  In 2009, the Nevada Supreme Court appointed him to serve as a Nevada Foreclosure Mediator during the first year of the program.

Mr. Reade was a mentor to many.  Since the inception of the program in 2006, he has continuously served as a "Partners in Pro Bono" Mentor through the Legal Aid Center of Southern Nevada and UNLV Boyd School of Law.   He was also a mentor for interns from the Las Vegas Advanced Technologies Academy Legal Studies program, introducing students to the practice of law.   Some of the UNLV law students and Legal Studies students who Mr. Reade guided have submitted letters of support for the Court's consideration.

When new opportunities to serve the community arise, Mr. Reade was one of the first to volunteer.  He was also in the first group of attorneys approved by the State Bar of Nevada and Nevada Supreme Court to serve as a Transitioning to Practice Mentor for new attorneys admitted to the State Bar of Nevada.   Through 2013, he annually volunteered to speak to elementary and high school students on Law Day.

Mr. Reade was selected as a founding Board Member of the Legal Aid Center of Southern Nevada Pro Bono Advisory Council and was tapped to chair a presentation at the 2013 State Bar of Nevada Convention on the new One Promise Nevada campaign through the Nevada Supreme Court Access to Justice Commission under which every attorney in the State of Nevada is asked to take one pro bono case.

In 2010, the seven Justices of the Nevada Supreme Court awarded Mr. Reade with the Legal Aid Center of Southern Nevada Pro Bono Attorney of the Decade.  He is the only person ever to receive such an award.

### Family and Community Life

While Mr. Reade's identity is enmeshed with his vocation as an attorney, his purpose and pride in life is his family.   In October 2007, he married Debra Miller and remarried her again in November 2007, so that all of their family and friends in Las Vegas and Omaha could be part of the wedding celebration.  He has three children, Sarah, age 12; Madeline, age five; and Robert Drake, age one and one-half.

Similar to Mr. Reade's childhood, his family was a part of his firm and business.  His wife worked as the office administrator and his mother-in-law served as the receptionist.  His three children were a constant presence in the law firm with their own desks at which to play.  Mr. Reade built his law firm around his family and was developing his family around the law.  As reflected in the support letters from his wife and eldest daughter, Mr. Reade is a devoted husband and father.

Beyond his commitment to his family and the legal profession, Mr. Reade readily  helps friends and strangers in need.  The support letters are replete with description of Mr. Reade's acts

of kindness and support to people suffering from emotional trauma, financial hardship, or health ailments.  The most profound act of charity is described in the letter written by Rebecca Z., who Mr. Reade and his wife met at a social function.  Rebecca was a single mother with significant health and financial issues, as more fully described in her letter.  She details for the Court how "Chris and Deb saved my life."

Mr. Reade is humbled and embarrassed by the personal stories shared about him in the many of the letters of support.  He did not help people for the sake of pride or recognition.  In addition to giving the Court insight into Mr. Reade's personal background, characteristics and traits, these letters demonstrate that Mr. Reade has many friends, family members, and colleagues who will provide solid support to him should this Court place him on probation in this community.

### *Mr. Reade's Extraordinary Community Service Supports  Leniency*

Seven years ago, Mr. Reade foolishly violated the law while representing his client, as discussed more fully below.  Both before and after the offense conduct, Mr. Reade has lived an otherwise extraordinary life of commitment to the law, his community, and family.  Mr. Reade continues to volunteer in a paralegal capacity as he awaits his punishment.

Ample case law supports a variance based in part upon Mr. Reade's active service to the community.  *United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) (affirming district court's choice of three months rather than 60 month guideline term for $5 million Medicare fraud conspiracy based in part on defendant's charitable work, community service, generosity with his time, and the spiritual support  provided to others); *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (affirming sentence of two years probation with three months home confinement for wire fraud despite a guideline range of 18-24 months. The district court did not clearly error in deeming the offense – characterized by the government as a two-year campaign to cover up a six-figure fraud on the Air Force – an "isolated mistake" in the context of Howe's entire life, which was otherwise upstanding and included military service, devotion to family, community, and church); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming four-level departure to probation in

securities fraud and tax evasion case based on defendant's good works where guidelines called for 14-21 months; defendant did not simply donate money to charity but organized and ran youth football team in depressed area and helped members attend better schools and go to college which qualified as exceptional because they entail "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."); *United States v. Serafini,* 233 F.3d 758 (3d Cir. 2000); *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998) (defendant's exceptional charitable efforts in taking in two troubled young women, financing their private education, and assisting an elderly friend's move from a nursing home justified departure).

 Mr. Reade's history of charitable works and good character gives this Court assurance that he will be an excellent candidate for probation.  A probationary sentence will permit Mr. Reade to continue to be a positive force in the community.  As Mr. Reade has so often shown compassion for others, the Court is urged to impose a sentence that reflects compassion towards him.

### Collateral Employment Consequences and Post-Guilty Plea Conduct

As the Court can readily discern, the loss of Mr. Reade's ability to practice law cuts deeply into the fibers of his identity and life's purpose.   The Court may properly consider the collateral consequences of this conviction when crafting a sentence which is no greater than necessary to achieve the goals of punishment.

Loss of employment was a permissible factor for a court to consider at sentencing, even in the era of mandatory guidelines. *See Koon v. United States*, 518 U.S. 81, 110 (1996) (even though the guidelines prohibit courts from departing on the basis of the defendant"s socioeconomic status, a court can still consider the effect of conviction on employment because "a defendant"s career may relate to his or her socioeconomic status, but the link is not so close as to justify a categorical exclusion of the effect of conviction on a career. . . . [S]ocioeconomic status and job loss are not the semantic or practical equivalents of each other.").

In today's era of individualized sentencing, the collateral consequences of a conviction factor into the Court's analysis of what constitutes "just punishment" and adequate deterrence under Section 3553(a).  *See, United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (finding that the

collateral consequences of defendant"s child pornography conviction should factor into its analysis of what constitutes "just punishment," including "the interruption of defendant"s education and employment, the dissolution of his engagement, and the stigma attached to this specific offense"); *United States v. Scott*, 503 F. Supp.2d 1097 (E.D. Wis. 2007) (finding that just punishment did not require prison sentence, in part, because "[d]efendant also suffered significant collateral consequences in the probable loss of her . . . job [as an educational assistant], which added to the punitiveness of her conviction"); *United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) ("suffered atypical punishment such as the loss of his reputation and his company"); *US v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ("lost his teaching certificate and state pension as a result of his conduct," consideration of which "is consistent with §3553(a)'s directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence.'").

In individualizing Mr. Reade's punishment, the Court is urged to consider the collateral loss of his law license and law practice. The Nevada Supreme Court's disciplinary action against Mr. Reade has already substantially advanced the goals of deterrence, protecting the community, and retribution.

Mr. Reade informed the State Bar of Nevada of his intention to plead of guilty. Mr. Reade resigned all appointments and Committee involvement effective December 31, 2013 to avoid collateral damage to those organizations on which he served. On January 15, 2014, he voluntarily went into inactive status with the State Bar of Nevada and State Bar of Arizona. The State Bar of Nevada stipulated to the initiation of proceedings to temporily suspend his license. On June 25, 2014, the Nevada Supreme Court issued an order of temporary suspension and referred him to the Southern Nevada Disciplinary Board for determination of the extent of discipline by the Bar.

Before leaving the practice of law, Mr. Reade took extraordinary measures to ensure the continuity of representation of his clients and the job security of his associates and staff. Attorney Edward Boyack describes in his support letter the efforts of Mr. Reade to achieve a smooth transition and to protect his clients.

The Court's attention is drawn to the support letters of Jon Carlston, Mr. Reade's former associate, and Barbara Buckley, Director of the Legal Aid Center of Southern Nevada.  Ms. Buckley writes that Mr. Reade's "work ethic in helping people in need was nothing short of extraordinary.  .  .  . He took cases no other lawyer would take, including ones where the clients did not speak English and were defrauded in an esoteric area of the law."  Mr. Carlston further elaborates upon some of the pro bono cases to which Ms. Buckley referred.  The Nevada Attorney General's Office and U.S. Department of Housing and Urban Development referred numerous members of the Hispanic community to the Legal Aid Center who were the target of various foreclosure scams.   Mr. Reade and Mr. Carlston initially worked in tandem to provide  pro bono representation for 13 additional victims were accepted by Mr. Reade's firm.  Those cases have grown to 28 cases to date.  Foreclosure schemes are complex, document intensive, and time-consuming to investigate and litigate.

When resigning from the practice of law, Mr. Reade informed the State Bar that he wished to continue to volunteer to assist in a paralegal/law clerk capacity in the representation of these homeowners.  Since January 15, 2014, Mr. Reade has volunteered a total of approximately 700 hours in performing support and administrative tasks such as running documents to the clerk's office, asset and defendant skip tracing, factual investigation, and organizing discovery.  This experience has been humbling to him, but his pride was trumped by his belief that the law is an instrument to help people.  As Mr. Carlston observed, "I have seen the devastating humbling which comes with being reduced from the named partner in a law firm to a volunteer legal assistant helping the poor; however Chris remains as dedicated as ever to wanting to help these people get justice.  To watch someone in the darkest hour continue to serve people has been inspiring."

If given a community-based sentence, Mr. Reade will most humbly endeavor to remain in the legal field as a support person stripped of his law license and bearing the stigma of a convicted felon.  Other attorneys will be reminded that unlawful conduct undertaken on behalf of a client will lead to punishment by the law and other social institutions.  In this regard, a probationary sentence

is one that is no greater than necessary to promote the goals of general deterrence and respect for the law.

## 2.     The Nature and Circumstances of Mr. Reade's Offense Conduct

### Introduction

Mr. Reade's offense conduct, when combined with his personal background, characteristics, and traits, supports a community-based sentence. Mr. Reade innocently became involved with Global One when his law firm was retained to provide litigation services.   In his zeal to assist his client, however, he subsequently engaged in unlawful conduct. More particularly, he made misrepresentations to the National Futures Association ("NFA")[1]  and he assisted in transferring funds, consisting in part of proceeds from "loans" that constituted unregistered securities.

As a point of emphasis, Mr. Reade was not motivated by greed or selfish desire.  Rather, he was overzealous in his efforts to assist his client without having full knowledge and understanding of the scope of Global One's fraudulent conduct which predated and continued during the course of his representation. Mr. Reade earned and expected nothing beyond his normal attorney fees and costs for his services to Global One and its members and owners.  Consistent with his personal history and character described above, he would not, and did not, act with the intent to defraud consumers of their money.  To the extent that his assistance in transferring funds may have negatively impacted consumers, Mr. Reade remains deeply regretful.

Both before and after *Booker*, courts have focused on the nature of the defendant's offense conduct and personal background as a more accurate proxy of culpability than a mechanical application of the guidelines.  The case law and commentators make it clear that there is a wide continuum of culpability in economic crime cases. A just sentence requires the careful analysis of

---

[1]     The NFA is an Illinois non-profit corporation registered with the Commodities Futures Trade Commission ("CFTC") as a futures association that serves as an independent, self-regulatory organization for the futures industry. It has registration requirements and rules to protect the futures marketplace.

the individual's culpability level to distinguish between the predatory fraudster and a person led astray.  *See, United States v. Watts*, 707 F.Supp.2d 149, 155-58 (D. Mass. 2010)(varying significantly from fraud guidelines based on an evaluation of defendant's relative culpability compared to co-defendant, his motive and intent, and lack of financial gain in computer hacking and identity theft case);  *United States v. Emmenegger,*  329 F. Supp. 2d 416,427 (S.D. NY 2004)(finding fraud guidelines place excessive weight on monetary loss when amount stolen in many cases is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence");  *United States v. Forchette*, 220 F.Supp.2d 914, 924-27 (E.D. Wis. 2002)(citing cases supporting leniency based on evaluation of defendant's "diminished" motive and intent for entering and participating in fraud; inferior role in a fraud; limited knowledge or understanding of the nature and scope of the fraud; limited or no gain; and multiple causation for the actual loss beyond the defendant's conduct).

The Ninth Circuit has also ruled that evaluating the relative culpability of a defendant compared to other participants in a conspiracy is an appropriate analysis under the "nature and circumstances" of the offense under Section 3553(c)(1).  *United States v. Saeteurn*, 504 F.3d 1175, 1181-82 (9th Cir. 2007)(multiple defendant narcotics case).  The *Saeteurn* Court held that a sentencing court may properly adjust sentence according to adjust the sentence according to the varying levels of culpability while also taking into account the personal history and characteristics of each defendant.  Id. at 182.

The plea agreement in this case reflects a recognition that Mr. Reade bore far less culpability than Young, Willard, and others uncharged individuals.  The applicable guideline range, however, calls for a punishment that is greater than necessary to promote the goals of punishment in light of Mr. Reade's personal background and mitigating circumstances of his offense conduct.  The following chronology seeks to place into context the nature and circumstances of Mr. Reade's offense conduct.

14

*Initial Representation of Global One*

In early February 2007, one of Mr. Reade's acquaintances  referred Young to Mr. Reade's law firm.  Young telephoned Mr. Reade from Hawaii where he and Willard were vacationing.  He explained that he, Willard, and Hedquist owned Global One Group, LLC, a Nevada company.  He briefly described Global One as an internet-based educational service to train its members how to trade foreign currency, known as "FOREX trading."

Young wanted Mr. Reade's law firm to monitor an ongoing civil lawsuit pending in the Eighth Judicial District Court.  Young gave Mr. Reade the impression that he was a successful and legitimate businessman (and Global One a successful company) with plans to expand his business endeavors through technology.  The nature of the civil litigation added to the perception that Global One was a substantial business.

The litigation involved a dispute over a software product that was designed to automatically place foreign currency trades and the funding and creation of a Futures Commission Merchant ["FCM" or "FOREX brokerage house"].  Global One had agreed to pay $4.5 million to Global Edge Trading in exchange for ownership of the FXAdvisor software and a 45% interest in Omnibus Forex LLC.  Global Edge Trading was going to provide the software and establish Omnibus Forex, which was suppose to serve as a FCM.  Global One had already paid $3 million towards the purchase price of the software and approximately $1.5 million towards the capitalization of the FCM, the latter of which was held in the trust account of Alverson, Taylor, Mortensen & Sanders, a long-established law firm that represented Global One during this time-frame.   The ownership rights over Omnibus Forex and its assets (including the FXAdvisor software) were tied up in an ongoing litigation between Global Edge Trading and its principal Frank Conlin, and Conlin's former assistant, John Zanella.  The ownership of same software was the subject of another lawsuit filed against Global One Group, Global Edge Trading, and their respective principals.

Soon after he was retained, Mr. Reade noticed that Global One's registration with the

Nevada Secretary of State was in default and its annual list of officers was due.  Hedquist had

incorporated the company through a corporate service company in January 2006.  Mr. Reade

advised the Global One owners of the default.  Young related that he wanted to keep his name and

address off of the corporate filings, claiming that he was the subject of death threats.  He

represented that he had worked in the past as a bounty hunter and had been involved in

confidential security matters.  On or about February 15, 2007 (when Young and Willard were still

vacationing in Hawaii), Mr. Reade reinstated Global One's corporate status.  The owners of Global

One authorized Mr. Reade to list his law firm, Reade & Associates, as the nominee manager with

the expectation that they would appoint new nominee managers in the near future.  Mr. Reade was

working towards ensuring that the Global One owners and its related entities had proper corporate

structure and formalities.

Young also asked Mr. Reade to assist in resolving a dispute with Wells Fargo Bank over

Global One's merchant bank account. Alverson, Taylor, Mortensen & Sanders was already retained

by Global One for this purpose, and Mr. Reade worked in conjunction with that firm to attempt to

resolve the dispute.  Later in the month of February, Mr. Reade's firm intervened in the Global

Edge Trading and Omnibus litigation over the software in an effort recover Global One's monies

paid for the formation and capitalization of Omnibus Forex, including the software.

### Clients Attempts to Purchase CFG

In or about early March 2007, Mr. Reade and Young met for the first time face-to-face.

Young disclosed that in addition to providing educational services for a membership fee,  Global

One also served as an introducing party to the brokerages, for which fees were paid to Global One.

Young explained that many of Global One's members were being cheated or poorly serviced by the

brokerage firms ("FCMs") that placed their trades. Young stated that Global One had acquired

software to place and aggregate FOREX trades.  He further explained that the reason that Global

One had attempted to establish and develop Omnibus Forex as Global One's own FOREX

brokerage was to provide safe and reliable trades for Global One's members.   Throughout the

month of March 2007, Global One (especially Young) became increasingly frustrated at the lack of progress that Omnibus Forex would ever become an operating

FCM.

Later in March 2007, Young and Willard informed Mr. Reade that Global One wanted to purchase an operating FCM called Concorde Financial Group ("CFG").  At their request, Mr. Reade incorporated Way FX Corporation with the Nevada Secretary of State and listed himself as the incorporator and nominee officer on the initial list of officers on March 19, 2007.  Way FX was intended to be a holding company for business ventures acquired by Willard and Young, including CFG.  As with other entities for which he had acted as incorporator, Mr. Reade had reasonably expected that Young and Willard would provide a list of permanent officers in the future.

Young was outside of Nevada on March 19, 2007, and requested that Mr. Reade open an account for Way FX at Washington Mutual Bank.  Mr. Reade opened the account with his signature with the expectation that Young would add his name to the account once he was in Las Vegas.   Young transferred $1 million into this account from the Global One account held at Washington Mutual, over which Bonnie Simon, Young, and Young's wife had signatory authority. This money was intended to be used for the purchase of CFG.

In mid-April 2007, Young asked Mr. Reade to become a signatory on the Global One accounts held at Washington Mutual.  It is helpful to have some background on Global One's banking practices before Global One retained Mr. Reade.  In 2006, Hedquist had incorporated Global One in Reno, Nevada, after learning about the advantages of Nevada corporations at a seminar.  The owners of Global One selected Nevada because of it was touted as the "Delaware of the West," providing protection from liability and favorable tax environment.   Global One eventually established its company's presence in Las Vegas, using the services of Bonnie Simon of Corporate Credibility.

Beginning in October 2006, Simon and Global One entered an agreement for corporate services, including forwarding mail, resident agency, and authorizing money wire transfers. Simon introduced the Global One owners to Washington Mutual Bank where her other clients had accounts. The bank permitted people outside of Nevada to order wire money transfers so long as a local person provided an authorizing signature, known as a "wet signature."

In October 2006, Global One opened an account at Washington Mutual with Simon, Young, and Young's wife as signatories. Young routinely emailed the bank to order wire transfers; he informed Simon when the wire transfers were ready for signature; and then she would go to the bank and provide the wet signature on the required wire transfer documents. Other entities related to Global One, Maelee Enterprises, LLC, and Badie, Inc., also opened bank accounts at Washington Mutual with Simon as a signatory in 2006. These two Nevada corporations were holding companies apparently used by Young and Willard, respectively, to receive compensation from Global One.

Mr. Reade assumed the ministerial function previously performed by Ms. Simon. He did not exercise control over the Global One account beyond performing this function. Young related to Mr. Reade that the Simon could no longer handle the banking functions because she moved across town from the Washington Mutual branch. He asked Mr. Reade to take over the same function of providing a wet signature on the wire transfers that he ordered. Mr. Reade understood that Young and Willard resided in small towns in Montana that lacked a national bank. Since they transacted business from around the United States and other countries, they needed to use a national bank and wanted the bank to be in Nevada, the place of incorporation.

Wanting to be helpful to his new client and suspecting no wrongdoing, Mr. Reade agreed to serve in this capacity. On or about April 10, 2007, his name was added as a signatory on the accounts held by Global One and Maelee Enterprises. He later became a signatory on the Badie account. On or about March 19, 2007, amended lists of officers were filed naming Mr. Reade as the nominee officers for Badie and Maelee Enterprises.

Returning now to Global One's attempt to purchase CFG, while the purchase was under negotiation, the Commodities Futures Trading Commission ("CFTC") froze the customer and corporate accounts of CFG because it had became undercapitalized.  (The NFA required FOREX merchants to maintain an account with a specific amount of money on reserve sufficient to secure the trades of the investors).  Due to the freezing of the accounts, Global One customers lost their ability to trade.  A receiver was ultimately appointed over CFG, who transferred the CFG

accounts to another FOREX brokerage house without the approval of customers.

### Clients Purchase Trend Commodities

After the CFG transaction failed, Willard and Young informed Mr. Reade that one of the principals of CFG had directed Willard and Young to another FOREX brokerage firm called Trend Commodities ("Trend"), which was purportedly inactive and located in Florida.  Trend and its principals were already registered with the NFA.  Willard and Young wanted to quickly purchase the company and establish an office for the brokerage in Virginia, where a number of CFG employees were being laid off.

From the client's perspective, time was of the essence in the purchase of Trend.  Young and Willard wanted to hurry the purchase for the stated purpose of establishing a "safe place" for the Global One customer to places trades.  Some Global One customers were using CFG as their brokerage firm and were anxious to transfer their accounts from the brokerage firm selected by the CFG receiver and/or to be able to start trading again.  Young and Willard were traveling between Virginia and Florida and busied themselves with locating employees to staff Trend, as well as setting up the office space for Trend. Adding to the sense of urgency was Willard's and Young's desire to quickly hire some of the experienced staff of CFG before they took other jobs and became unavailable.

Vernon Hedquist, the other owner of Global One, had little involvement in the purchase of Trend, but he did assist in handling the computer technology issues relating to establishing a brokerage firm.  During this time period, Willard and Young became distrustful of Hedquist's

loyalty to Global One and feared that Hedquist was divulging confidential client information to Conlin, who was holding $3 million of Global One's monies and was breaching his contractual duties to Global One.  Eventually, Hedquist was removed from Global One and went to work in direct competition against Global One.  Shortly thereafter, Mr. Reade represented Global One in litigation against Hedquist.   On behalf of Global One, Mr. Reade initiated a lawsuit against Conlin and Global Edge Trading to recover the software and $3 million.

It was during the client's purchase of Trend that Mr. Reade crossed the line and violated the law.  Young and Willard negotiated the essential terms of the agreement for Way FX to purchase Trend for $1.25 million,  payable in installments and a $450,000 down payment.   Mr. Reade reviewed and revised the form of the purchase agreement drafted by Seller's counsel.  He communicated with the sellers' attorney, Willard, and Young for this purpose.   Young and Willard decided that Mr. Reade would sign the purchase documents on behalf of Way FX and would work to ensure that Way FX had proper corporate structure and formalities.  Willard and Young were going to designate a list of new officers for Way FX once the sale was consummated, final payments made and prior to beginning trading.

During the process of negotiations, Mr. Reade learned from the sellers of Trend that, as the officer of record for Way FX during the pendency of the sale, he would need to register with the NFA as a member in his individual capacity.   Mr. Reade had no prior experience with futures regulations and primarily relied upon the sellers and Seller's lawyer to satisfy NFA requirements. Mr. Reade registered with the NFA as an individual member on or about April 27, 2007.  One of the sellers of Trend electronically signed Mr. Reade's name without his knowledge in the NFA's computerized registration system to identify him as the general principal of Trend.

Young was not physically present in Nevada and unable to open accounts for Trend.  He directed Mr. Reade established bank accounts at Washington Mutual in the name of Trend with himself as the signator, same as done with WayFX.  As stated above, Young had previously wired the $1 million into Way FX account in anticipation of the CFG purchase on March 19, 2007.  In

April 2007, Young directed Washington Mutual Bank to order a wire transfer of $1.25 million from Global One's bank account to the WayFX account to effectuate the purchase and capitalization of Trend.  These monies were used to purchase Trend, as well as to fund the required capitalization account required by the NFA.  To document the transfer of funds between the entities and to be clear on the corporate books, Mr. Reade created a loan agreement between Global One and Way FX that showed the monies loaned from one entity to the other.  Once the sale of Trend was commenced, some Global One members began to transfer and fund trading accounts to Trend.  Before trading could or would occur through these accounts, however, Young and Willard were to identify new officers for Trend.

### Mr. Reade's Misrepresentations to NFA

On or about May 11, 2007, the NFA learned from another FOREX brokerage house that Global One was behind the purchase of Trend.  A few days later, Vern Hedquist also contacted the NFA and disclosed that Global One's monies were being used to purchase Trend.  The NFA promptly began an audit of the Trend purchase.

On various occasions during the course of the investigation, Mr. Reade knowingly made untrue statements to the NFA in order to facilitate the purchase of Trend on behalf of his clients. On May 23, 2007, one of the sellers of Trend drafted a letter to the NFA for Mr. Reade's signature which contained misrepresentations about the purchase money coming from Mr. Reade's personal assets.  Mr. Reade edited this letter and signed it, knowing that it contained untrue statements. Mr. Reade concealed from the NFA that Global One funds were used to purchase Trend and misrepresented that the funds were his personal contributions.   When the NFA came to his law office unannounced on June 4, 2007, Mr. Reade did not volunteer information about his nominee status and lack of ownership interest in the funds, conflating his efforts to protect his attorney-client privilege with his duty to speak truthfully to the NFA.   Mr. Reade offers the Court no excuses for his misconduct and has accepted responsibility for his wrongdoing through his guilty plea.

As with Omnibus Forex and CFG, when the prospects of being able to trade quickly evaporated, Willard and Young abandoned the Trend project and began looking for a brokerage firm to conduct trades overseas.  The sellers of Trend selected an attorney to represent Trend and Mr. Reade during the NFA investigation.  Mr. Reade and the attorney began the process of gathering records requested by the NFA which were primarily located in Virginia and Florida.  Additionally, they began to return the customers' funds that were deposited in the Trend account.  No customer funds were ever traded.  No customer funds were lost.

In short order, the NFA initiated a member responsibility action against Trend to discipline it.  On August 2, 2007, Mr. Reade, accompanied by counsel, attended a meeting with the NFA in Chicago and brought the requested banking and business records substantiating the source of the funds to purchase Trend.  Mr. Reade disclosed the involvement of Global One in the purchase of Trend.  The NFA reprimanded Mr. Reade and imposed a life-time bar against him from engaging in the FOREX industry and accepted a voluntary withdrawal of Trend from membership.  All monies were returned to customers who deposited funds in the Trend account, and no losses were incurred as Trend never became an active brokerage firm.

The purchase money and capitalization money were reversed and returned to the Global One account.  August 8, 2007, Young ordered Washington Mutual to transfer Global One monies to his Paystone account located at the Bank of America in the State of Washington and to FINEX Group, GmbH, a FOREX brokerage house based in Switzerland and registered with the Massachusetts Secretary of State.   Mr. Reade went to Washington Mutual Bank to provide the wet signatures for the transfers.  After the transfers, Mr. Reade continued to provide legal representation for Global One in its ongoing dispute over the software, as well as other lawsuits that arose involving Hedquist and a Global One customer.

### *Clients Ignore Legal Advice on Soliciting Unregistered Securities*

At some point during his representation of Global One, Mr. Reade became aware that Global One was entering loan contracts with some of its members.  He had received a copy of one of the loan agreements, reviewed it, and promptly advised the client to stop soliciting loans

because they constituted the sale of unregistered securities and to return and repay all monies taken in under such agreements. He advised the clients that they would have to immediately pay the money back to the lenders/investors. In this regard, Mr. Reade acquired knowledge that a portion of Global One's monies were derived from the unlawful sale of unregistered securities. Mr. Reade represented Global One in a lawsuit by one of the customers, Patrick Walsh. During a hearing in February 2008, he learned from Young for the first time that Global One received over 1,700 loans over time. Consistent with the direction of the District Court in that litigation, Mr. Reade again advised Young and Global One to immediately pay back any outstanding loan agreements. It was not until later, however, that he learned that Young and Willard did not heed his advice to stop soliciting loans and repay the loans in full.

### Points in Mitigation on Mr. Reade's Inferior Role in Clients' Fraud

As stated above, Mr. Reade does not make excuses for his misconduct respecting the NFA investigation. The following mitigating factors are presented to place his conduct into perspective. As an initial point of emphasis, none of the above events occurred in a vacuum. Throughout the representation of Global One's interests, Mr. Reade managed and operated a busy law practice, represented numerous other clients, performed *pro bono* service, worked extremely long days, and maintained an active family life. In fact, on the day that he returned the deceptive letter to the NFA, Mr. Reade had been up all night dealing with the County coroner's office and a distraught family because his father-in-law was found dead of cardiac arrest overnight.

Mr. Reade provided legal services to Global One. He did not have knowledge of the company's day-to-day operations. He did not watch the Global One's internet seminars. He was unaware that Young and Willard were making false statements to the public about the company's profitability and trading capabilities. He did not monitor the company's financial affairs. He did not scrutinize the bank statements for the accounts on which his signatory authority. He did not trade in foreign currencies. He did not invest money in the business or expect to receive, and in fact did not receive, any profit or compensation beyond ordinary attorney fees through his firm and

1  reimbursement of litigation costs.  He did not intend to defraud consumers; in fact he had no

2  contact or relationship with the consumers.

3       The *Forchette* Court, a pre-*Booker* case, ruled that a sentencing court may properly depart

4  from the guidelines to take into account a defendant's low-level of culpability or "diminish"

5  motive and intent while participating in a fraudulent scheme:

6          [T]he defendant may have had a limited or inferior role in the fraud that bore little
        relationship to the amount of the loss; he may have had little or no knowledge of the
        amount being taken, such that it would be unfair to attribute the entire amount of
7          loss to him; his intent in involving himself in the scheme may have been
        significantly different than that of the usual fraud defendant, e.g. he may have
8          entered the scheme with honest intentions or with the intent to make good on his
        obligations; his fraudulent representations may have been of limited materiality, as
        where he could have obtained a loan by truthful means but at a higher interest rate;
9          or the defendant's fraud may have been for little or no gain, especially in
        comparison to the size of the loss.

10  *Forchette*, 220 F. Supp.2d at 925.

11       Mr. Reade's offense conduct meets the definition of an inferior role in a complex fraud.

12  His role bore little relationship to the financial loss suffered by Global One members.  He did not

13  know of the broad scope of the fraud committed by his clients.  He himself was misled by Young

14  into believing that Global One was a legitimate, successful and profitable business pursuing growth

15  opportunities.  Mr. Reade's intent in assisting Global One was quite distinct from the *mens rea* of

16  the typical defendant in economic crimes cases.  He acted as a business lawyer applying the

17  Nevada incorporation statutes which permit the true ownership of a corporation to remain

18  confidential and actively litigated on behalf of this client(s).  Mr. Reade served as a nominee

19  officer and manager of the various Global One-related entities with the expectation that new

20  officers and managers would be appointed.  He did not form the corporations with fraudulent

21  intent.  He believed that he was properly protecting his clients' interests pursuant to Nevada

22  corporate law and within the boundaries of protecting his client's confidential information.

23       Mr. Reade's intent was to provide zealous representation of his client's interests.   He

24  admittedly placed himself in a bad situation and crossed over the line when making false

25  statements to the NFA.  His overzealousness  violated his ethical duties and the law.   Fortunately,

26  his misrepresentations to the NFA had limited effect.  Before even interviewing Mr. Reade, the

NFA was already aware that Global One was behind the purchase of Trend and Mr. Reade was its attorney with signature authority over its accounts.  The NFA was poised to bar the operation of Trend.  Mr. Reade belatedly provided disclosure of the source of the monies to the NFA and ensured that all the customers' deposits in Trend were promptly returned to the customers.  The NFA took swift action to sanction Mr. Reade and barred him from participating in the FOREX industry.

Mr. Reade's agreement to place his name on his client's bank accounts may have reflected poor judgment, but not the *mens rea*  typically associated with a defendant in an economic offense.  Like Bonnie Simon, Mr. Reade agreed to provide wet signatures for the wire transfers that Young had previously called into the bank. Mr. Reade did not control the financial affairs of Global One.  Young controlled the financial affairs of the company.  Young contacted the Washington Mutual Bank in Las Vegas and ordered the various money transfers and purported to keep the books of Global One with Global One staff.  Afterwards, Mr. Reade performed the ministerial function of signing the wire transfer documents.  He did this with the honest intentions of providing a convenience to the client.   This effort  to help his clients in this regard ultimately became the impetus for instant offense.  Under the *Forchette* analysis, however, this role of provider of the wet signature was relatively immaterial to the Global One's overall scheme.

In some respects, Mr. Reade's devotion to the principle that the law is an instrument for helping people and earnest desire to help his clients became his tragic flaw in this matter.  In his zeal to represent his client's interests, he made misrepresentations to the NFA auditors in disregard of the organization's function to protect the futures industry.  As the incorporator and nominee officer of the Global One entities, he helped to execute the wire transfers directed by Young.

The undersigned counsel's legal and factual analysis of Mr. Reade's relatively low-level of culpability in no way diminishes his sense of remorse and acceptance of responsibility.  To the extent that his assistance to Global One caused any harm to consumers, Mr. Reade expresses sincere remorse.   Moreover, he is remorseful and mortified for bringing any discredit to the legal profession, his law firm, his clients and his family.  Mr. Reade was not an attorney who extensively

advertised or marketed; his name and reputation were his stock and trade, tools which he has forever lost and irreparably tarnished.   As his hundreds of hours of otherwise-anonymous work for *pro bono* cases demonstrates, no amount of good deeds over years can ever restore the destruction which he has caused.

### 3.   A Community-Based Sentence is Appropriate Punishment

It is unnecessary to incarcerate a man like Mr. Reade given his personal background and characteristics and taking into account his offense conduct.  A community-based sentence does not represent a "mere slap on the wrist."   United States v. Ruff, 535 F.3d 999, 1004 (9th Cir. 2008). As the Supreme Court noted, probation represents a substantial restriction on a person's liberty. United States v. Gall, 552 U.S. 38, 43 (2007); *see also,* Ruff, 535 F.3d at 1004.  Indeed, a community-based sentence is a kind of sentence that must be considered under the Sentencing Reform Act as a punishment that may be sufficient, but not greater than necessary, to carry out the goals of sentencing.  *See,* 18 U.S.C. 3553(a)(3).

A sentence of probation is a punishment that is no greater than necessary to satisfy the following goals of punishment:

Respect for the Law and General Deterrence

A probationary sentence will promote respect for the law and act as a general deterrent to others.  If given probation, Mr. Reade will remain in the community and hopes to perform paralegal or staff support work.  He will serve as a reminder to others that there will be consequences for violating the law during the course of rendering legal services.   As part of his punishment, Mr. Reade has agreed to pay to the United States the sum of $75,000.   This monetary penalty, along with the collateral employment consequences, also sends a message of general deterrence and punishes Mr. Reade.

Finally, the incarceration of Young and Willard has already satisfied the goal of general deterrence fraudulent conduct in the marketplace.  A probationary sentence for Mr. Reade garners respect for the criminal justice system because it fairly punishes the relative culpability of the three defendants while taking into account Mr. Reade's unique personal background and good character.

<u>Individual Deterrence and Protecting Society</u>

The Court can be assured that Mr. Reade will not recidivate.  He is a mature and responsible father and husband with a life-long history of community service and charitable work. The collateral consequences of this conviction have been severe.  He has surrendered his law license and lost his livelihood in a profession that defined his as a person.  The NFA has barred him for life from any involvement in the futures industry.

Mr. Reade will bear the stigma of an ex-felon for life, depriving him of the right to exercise valuable civil rights and substantially impairing his ability to engage in gainful employment and secure work in the only profession he has ever known.   While it may seem negligible to many, the loss of civil rights is a crushing blow for Mr. Reade as an active citizen in political and social matters.  From a personal standpoint, he is extremely embarrassed by his involvement in the scheme.

In the words of Abraham Lincoln, "Mercy bears richer fruit than strict justice."   A sentence of probation will more than adequately carrying out the goals of punishment and permit Mr. Reade to redeem himself while continuing to be a valuable member of this community.


DATED this 8th day of July 2014.


Respectfully Submitted,

WRIGHT STANISH & WINCKLER

By:           /s/

Richard A. Wright
Margaret M. Stanish
Counsel for R. Christopher Reade

27

**CERTIFICATE OF SERVICE**

In accordance with 49(c) of the Federal Rules of Criminal Procedures, the undersigned certifies that on the 8th day of July 2014, I caused a true copy of R. Christopher Reade's Sentencing Memorandum to be electronically served by the U.S. District Court's CM/ECF system to the parties denoted in the Electronic Filing System in this matter.

A courtesy copy will also delivered to Probation Officer Leonel Sanchez by hand-delivery or electronic mail.

_____ /s/
_____ Margaret M. Stanish