Richard A. Wright
Nevada No. 886
Margaret M. Stanish
Nevada No. 4057
WRIGHT STANISH & WINCKLER
300 S. Fourth Street, Suite 701
Las Vegas, NV 89101
Phone:  (702)382-4004
Fax:     (702)382-4800
Counsel for E. Christopher Reade

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. 2:14-CR-00022-KJD-CWH |
| Plaintiff, | ) |
| | ) **DEFENDANT'S OBJECTIONS** |
| vs | ) **TO PRESENTENCE INVESTIGATION** |
| | ) **REPORT** |
| R. CHRISTOPHER READE, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

      R. Christopher Reade, by and through his attorneys, Richard A. Wright and Margaret M.

Stanish, Wright, Stanish & Winckler, submit the following objections and corrections to the

revised Presentence Investigation Report ("PSI"), dated July 2, 2014.

      The original PSI, dated March 28, 2014, fairly reflected the parties' agreement to the facts

supporting the plea memorandum.  On April 15, 2014, the government requested that the Probation

Office make extensive changes to the description of the offense conduct and proposed language for

the its revisions.  On April 16, 2014, defense counsel wrote the Probation Office in disagreement

with the government's proposed revisions.  Counsel advised the Probation Office that, although it

did not receive complete discovery, the proposed revisions appeared to contain a number of

erroneous facts and  assumptions, some of which were more appropriate for argument at

sentencing.[1]  The Probation Office then requested that the government provide records to support its revisions.  By letter dated April 24, 2014, the government provided a number of records to the Probation Office.  *See*, Addendum to PSI.  The Probation Office adopted nearly verbatim the government's requested revisions and finalized the PSI on July 2, 2014.

Mr. Reade makes objections and clarifications to the below revisions proposed by the government and adopted by the Probation Office.  The revisions contain a number of inaccurate facts and inferences and neglect to present mitigating information.  In light of the procedural posture of this case and as a matter of fairness, the defense requests that the Court adopt the description of the offense conduct contained in the PSI, dated March 28, 2014.  If the Court prefers to amend the final PSI to correct the inaccuracies and include mitigating information, alternative language is proposed below.

**Paragraph 9:**   This paragraph was amended to provide more information about the misconduct of Young pertaining to their misrepresentations to consumers and soliciting "loans," which were repaid through a Ponzi scheme.  The defense does not object to the characterization of Willard's and Young's misconduct.  It clarifies, however, that Mr. Reade did not have knowledge and an understanding of the scope of their fraudulent conduct as described in Paragraph 9.  This clarification is important because of broad language included in the revisions to Paragraph 15.

**Paragraph 15:**   The defense objects to the modification of Paragraph 15, which now reads in its entirety: "As of February 2007, Young intended to launder the proceeds of his fraud by

---

[1]    This matter was resolved though pre-indictment negotiations during which the government provided limited discovery.  On May 7, 2007, defense counsel requested that the government provided any *Brady* material that would have a tendency to mitigate the punishment in light of the government's letters requesting revisions to the offense conduct. Over time, the government produced materials that it believed to be responsive to the defense request and recently provided copies of the voluminous discovery in the Young trial and approximately 8,516 pages of other documents.  The government offered to continue the sentencing to afford defense counsel more time to review the records, but the defense declined the offer.

2

purchasing a FOREX broker named Trend Commodities.  From February 2007 to August 2007, Reade intentionally assisted Young in laundering the proceeds of the fraud through the purchase of Trend."

The statement is factually incorrect and  appears to infer a broader criminal intent on the part of Mr. Reade at a time when he was acting innocently in his representation of Global One.  To the extent that this paragraph implies that Mr. Reade was aware of Young's and Willard's fraudulent representations made to consumers as described in Paragraph 9, the defense further objects.  Mr. Reade was unaware of the contents of their communications to consumers made during web-seminars or conference calls.   Mr. Reade's position is that he acted in good faith when representing Global One's interests up until the time frame when he agreed hold himself out as the purchaser of Trend Commodities in or about April 2007.

The following alternative language, which is derived from the plea agreement, is suggested to replace Paragraph 15:

> *In March 2007, Young intended to purchase a FOREX broker, named Trend Commodities ("Trend"), using proceeds derived in part from the "loans" from Global One members.  In or about April 2007, Mr. Reade acted as an accessory-after-the fact to certain money laundering transactions initiated by Young.*

**Paragraph 16.**  The revision to this paragraph inaccurately states that Mr. Reade was added as a signatory to Global One's Wells Fargo Bank account on February 15, 2007, the date upon which his law firm was listed as manager of Global One with the Nevada Secretary of State.  Mr. Reade was never a signatory on the Wells Fargo Bank accounts.  He did not have any signatory authority on any account of Global One until April 10, 2007.  (The error in dates may account for the erroneous inferences that Mr. Reade was knowingly involved in wrongdoing in February 2007, as stated in the revised Paragraph 15.)

According to the discovery, Mr. Reade's signature was added to the accounts held at Washington Mutual Bank in the name of Global One and Maelee Enterprises on April 10, 2007.  The discovery states that the date on which Mr. Reade became the signatory on Badie is not listed

3

on the bank records.  Bonnie Simon of Corporate Credibility, a corporate service company, was also listed as an authorized signatory on these accounts.  (Bate-stamp nos. 8532-33; 8536).

Bonnie Simon provided various corporate services to Global One and its owners.  Simon, Young and his wife, were authorized signatories  on the Washington Mutual account held in the name of  Global One.  Beginning in October 2006, Simon and Global One entered an agreement for corporate services,  including forwarding mail, serving as resident agent, and authorizing money wire transfers.  She introduced Young to Washington Mutual Bank where her other clients had accounts.  The bank permitted people outside of Nevada to order wire money transfers so long as a local person provided an authorizing signature.  She testified that Young emailed the bank to order wire transfers; Young informed her that the wire transfers were ready for signature; and then she would go to the bank and sign the required wire transfer documents.  She further testified that she became too busy to drive across town to perform this function, so Young had Mr. Reade take over authorization of wire transfers around May 2007.  (*U.S. v Young*, Case No. 3:08-cr-120-LRH-VPC, Trial Transcript, May 17, 2001, pp. 621-26).

Mr. Reade assumed the ministerial function previously performed by Ms. Simon.  He did not exercise control over the account beyond performing this function.  Upon information and belief, the government's analysis of these accounts did not show any other transactions by Mr. Reade aside from providing the signature on the wire money transfer documents in connection with the Global One accounts.

Soon after he was retained by Global One, Mr. Reade learned that the company's registration with the Nevada Secretary of State was in default and a list of officers was due.   Mr. Reade cured the default and filed the new list of managers on February 15, 2007, while Young and Willard were vacationing in Hawaii.  They, along with the third owner, Vernon Hedquist, authorized him to file a list of managers designating his law firm as the nominee manager.  At the time, Mr. Reade expected that they would designate new managers in the future.  Mr. Reade's position is that he acted innocently and in good faith when listing his law firm as the nominee

manager. Willard related to the undersigned counsel's investigator that, to the best of his knowledge, Mr. Reade was to serve only temporarily as the officer of Global One, Way FX, Trend, Badie, and Maelee, and that they intended to designate other officers once a newly acquired FOREX brokerage house was acquired and operating. The new officers/managers of the FOREX brokerage house would likely need to register with the NFA and be subjected to its oversight and financial reporting requirements.

The following alternative language is suggested to correct the inaccuracies of Paragraph 16:

> On February 15, 2007, Mr. Reade, at the direction of the owners of Global One (Young, Willard, and Hedquist), reinstated Global One's registration with the Nevada Secretary of State and filed a list of managers designating Reade & Associates as the nominee manager. Mr. Reade expected that the owners would select different managers at a later date. On March 19, 2007, Mr. Reade was designated as the nominee officer for Maelee Enterprises and Badie, Inc. On or about April 10, 2007, Mr. Reade's signature was added to the Washington Mutual Bank accounts held in the name of Global One and Maelee Enterprises, so that he could perform the ministerial function of providing a signature on money wire transfers ordered by the account holders. (This function was previously performed by Bonnie Simon of Corporate Credibility, LLC.) On various occasions thereafter, Young would contact the bank and order wire money transfers from Global One's account to various other accounts. Young would then inform Mr. Reade when the wire money transfers were ready for authorizing signature. Mr. Reade would then go to the bank and sign the wire transfer documents.

**Paragraph 17**. This revision incorrectly states that Way FX was formed for the "sole purpose of purchasing Trend Commodities." In an interview with the government on August 13, 2012, however, Willard explained that WayFX was formed to be a holding company for various business ventures that he and Young would own.

On March 19, 2007, Mr. Reade incorporated Way FX at Young's direction. He served as the incorporating and nominee officer of Way FX, again with the expectation that new officers would be appointed at a later date. Mr. Young was outside of Nevada when he asked Mr. Reade to opened a bank account for Way FX at Washington Mutual. On March 19, 2007, Mr. Reade opened

the Way FX account with his signatory authority.  He fully expected that Young was going to add his signature to the account at a later date when he was present in the Las Vegas area.

Initially, Young and Willard intended to use Way FX as holding company for the anticipated acquisition of CFG.  When the purchase of CFG fell through, Young and Willard learned of that Trend was available for purchase on or about March 22, 2007.  They decided to used Way FX to purchase Trend.          The following language is suggested to correct Paragraph 17:

> *On March 19, 2007, Mr. Reade, acting as incorporating and nominee officer, incorporated Way FX at the direction of Young.  Mr. Reade opened a bank account fro Way FX at Washington Mutual Bank. He had signatory authority over the account* and expected Young to add his signature at a later date. *It was expected that new officers would be designated at a later date. Way FX was to be a holding company for future acquisitions by Young and Willard, including the anticipated purchase of CFG.  Later in March 2007, Young and Willard decided to use Way FX to purchase Trend.*

**Paragraph 18**.  This revised paragraph contains a few errors.  Reade signed the purchase agreement for Trend on April 7, 2007, not April 5, 2007.  The purchase price was $1.25 million payable in installments.  The PSI incorrectly states that the purchase price was $2.25 million.

Young transferred of $1 million from the Global One account into the WayFX account on March 19, 2007, when he intended to purchase CFG.  Nonetheless, these funds would later be earmarked to fund the capitalization account for Trend, which was required by the NFA to secure trades.  On April 25, 2007, Young directed the money wire transfer of $1.25 million from the Global One account to the WayFx account for the purpose of purchasing Trend.

The propose language may be used to correct the errors in Paragraph 18:

> *On April 7, 2007, Mr. Reade signed the Purchase Agreement with Trend Commodities on behalf of Way FX, which provided for the sale of Trend for the purchase price of $1,250,000, payable in installments.  On or about March 19, 2007, Young had deposited $1 million from the Global One account into the Way FX account when he contemplated purchasing CFG.  When the purchase of CFG fell through, this money would have been used for Trend's  capitalization account, which was required by the NFA to secure trades.  On April 25, 2007, Young directed the transfer of $1.25 million from the Global One account to the Way FX account for the purpose of purchasing Trend.*

**Paragraph 19:**   The following revision to this paragraph should be stricken as an inaccurate and unfair inference: "Young, Willard, and Reade stood to gain substantial amount of brokerage fees and commissions in Way FX's ownership of Trend Commodities."

Mr. Reade was a nominee manager of Way FX and Trend and expected that Young and Willard would designate new managers. He was only paid ordinary attorney fees.  He neither received nor expected to receive any brokerage fees or commissions from Way FX and Trend. From the trial testimony and interviews of the government's cooperating witness, William Willard, it is clear that Young and Willard were the ones who intended to control and profit from the operation of Way FX and Trend, not Mr. Reade.

Willard confirmed to the undersigned counsel's investigator that, to the best of his knowledge, he and Young never intended that Mr. Reade would have an ownership interest in any of the companies on which he was temporarily serving as a temporary nominee officer, including Global One, Way FX, Trend, Badie, and Maelee.  They never intended that he would receive commissions or potential profits from these companies. Willard further confirmed that Mr. Reade received only legal fees for his work respecting these companies.

Paragraph 19 also describes Young's misrepresentations made to customers during conference calls.  Mr. Reade did not participate in these calls and did not know of Young's misrepresentations.  The following clarification should be added to the PSI:

> *Mr. Reade did not participate in the Global One conference calls between the Global One owners and its members and he did not know of the misrepresentations that they made during the conferences.*

**Paragraph 20:**   This revision to the PSI describes the NFA's responsibilities as set forth on its website.  It states that membership in the NFA is mandatory, but that was not the case in 2007.   In 2007, individuals and businesses engaged in the "spot trading" of off-exchange retail foreign currency were not subject to the regulation of the U.S. Commodity Futures Treading Commission ("CFTC").  *See,* CFTC v. Zelener, 373 F.3d 861 (7th Cir. 2004)(holding foreign currency transactions were spot contracts for delivery within 48 hours and, therefore, not subject to

7

CFTC jurisdiction).  Effective October 18, 2010, the CFTC  regulatory authority was expanded to cover retail foreign currency transactions.  75 FR 55410 (Sept. 10, 2010).  Nonetheless, prior to 2010, those engaged in off-exchange retail foreign currency trading could voluntarily register as members of the NFA and thereby come under its regulations.

**Paragraph 22.**   This paragraph should be revised to certain mitigating information and to correct errors in dates.

According to NFA reports,  the NFA was aware that Global One was funding the purchase of Trend and Mr. Reade served as its attorney before it sought to interview him. On May 11, 2007, another FOREX brokerage house informed the NFA of Global One's involvement in the purchase.  On May 16, 2007, Vernon Hedquirst, also contacted the NFA and provided more information about Global One's practices and involvement in the purchase of Trend.  He also stated that Mr. Reade was Global One's attorney and his signature was on its account.

Mr. Reade avoided speaking with the NFA auditor on May 23, 2007, because he was occupied with the unexpected death of his father-in-law.  He did, however, review and edit a deceptive letter to the NFA that was drafted by one of the owners of Trend.  The letter was dated May 23, 2007, not May 25th.

The PSI contains incorrect information and inferences regarding Mumford Enterprises. Mumford was a dormant company incorporated on March 9, 2007 (not on May 14, 2007) for purpose unrelated to the purchase of a FOREX brokerage firm.  Young and Willard were suppose to designate a new manager for Global One.  When they continued to delay this designation, they authorized Mr. Reade to name Mumford as the replacement manager until they could designate an alternative.  On May 14, 207, Mr. Reade filed the change of managers with the Nevada Secretary of State.  This was not done to conceal his law firm's relationship with Global One because such information was readily available as a public record and was likely accessible through the Secretary of State's website.

*On or about May 11, 2007, the NFA learned from another FOREX brokerage*
*house that Global One was behind the purchase of Trend.  On May 16, 2007,*

*Vern Hedquist also contacted the NFA and disclosed that Global One's monies were being used to purchase Trend and Mr. Reade was its attorney with signatory authority over its bank account.  The NFA promptly began an audit of the Trend purchase. Mr. Reade and others made misrepresentations to the NFA auditors during the course of the investigation.  On or about May 23, 2007, the NFA attempted to speak with Mr. Reade but he was unable to speak with the caller because he was occupied with the death of his father-in-law who died the night before.  Mr. Reade reviewed and edited a letter, dated May 23, 2007, that was drafted by one of the Trend owners. The letter was submitted to the NFA. Mr. Reade was aware that the letter contained misrepresentations that the funds used by Way FX  to purchase Trend came from his personal contributions and assets.  On or about May 14, 2007, Mr. Reade filed an amendment of the managers list for Global One with the Nevada Secretary of State, replacing his law firm with Mumford Enterprises.  Mumford was a dormant company that was incorporated on March 9, 2007, and was used as a new manager because Young and Willard had not yet identified new managers for Global One.*

**Paragraphs 24.**   Mr. Reade objects to the accuracy of the description of the meeting between NFA representatives, Mr. Reade and his attorney.  The PSI states that Mr. Reade misrepresented at this meeting that Global One funds were used to purchase Trend.  This contradicts the statement in Paragraph 23, in which the NFA was informed that the funds were from Global One.  Furthermore, the NFA records of the August 2, 2007 meeting, some of which the government submitted to the Probation Office, indicated that Mr. Reade and his attorney disclosed the involvement of Global One in the Trend purchase; Mr. Reade's role as Global One's attorney and nominee manager; the fact that he was only paid for legal services; the pending litigation with Global Edge Trading; the names and roles of people and entities connected with Global One; and other information.

There are some inaccuracies in the description of money transactions occurring in August 2007.  Young directed that the funds held in the Way FX account be returned to Global One's account.  On or about August 8, 2007, Young directed the Washington Mutual Bank to transfer $600,000 to FINEX Group GmbH, and $670,000 to his Paystone account held at a Bank of America branch in Lynnwood, Washington.  FINEX was a Swiss company located overseas and registered with the Massachusetts Secretary of State. After Young ordered these two wire transfers, Mr. Reade went to the bank and provided the wet signatures authorizing the transfers.

The following language is suggest to correct Paragraph 24:

*At a meeting with NFA representatives on August 2, 2007, Mr. Reade disclosed Global One's involvement in the purchase of Trend, as well as other information about his role as attorney and nominee manager.  At the direction of Young, Mr. Reade returned the monies held in the Way FX account to the Global One account at Washington Mutual.  On or about August 8, 2007, Young directed the Washington Mutual Bank to transfer $600,000 to FINEX Group GmbH, a Swiss company located overseas and registered in as a domestic company with the* Massachusetts Secretary of State*; and $670,000 to his Paystone account held at a Bank of America branch in Lynnwood, Washington.  After Young ordered these two transfers, Mr. Reade went to the bank and provided the wet signatures authorizing the transfers.*

For further detail on the nature and circumstances surrounding Mr. Reade's offense, defense counsel refers the Court to the Defendant's Sentencing Memorandum.  The above objections to the PSI are made in good faith and based in part upon materials provided to the Probation Office by the government; a preliminary review of voluminous discovery recently received; and counsel's independent investigation.  Counsel's corrections to the PSI in no way distract from Mr. Reade's acceptance of responsibility in this matter.

DATED this 8th day of July 2014.

Respectfully Submitted,

WRIGHT STANISH & WINCKLER

By:        /s/

_____

Richard A. Wright
Margaret M. Stanish
Counsel for R. Christopher Reade

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**<u>CERTIFICATE OF SERVICE</u>**

In accordance with 49(c) of the Federal Rules of Criminal Procedures, the undersigned certifies that on the 8th  day of July 2014, I caused a true copy of R. Christopher Reade's Objections to Presentence Investigation Report to be electronically served by the U.S. District Court's CM/ECF system to the parties denoted in the Electronic Filing System in this matter.

A courtesy copy will be delivered to Probation Officer Leonel Sanchez by hand-delivery or  electronic mail.

/s/
Margaret M. Stanish